IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
NO. 7:14-CV-4-BR

ELIZABETH A. MERRILL,

               Plaintiff,

v.                                           ORDER

GINA MCCARTHY,

               Defendant.

This matter is before the court on defendant's motion for summary judgment, (DE # 47), and plaintiff's motion for partial summary judgment, (DE # 53). The motions have been fully briefed and, therefore, are ripe for disposition.

## I.     BACKGROUND

After having served honorably in the United States Coast Guard for twenty years and working for five years in federal law enforcement agencies, plaintiff began working for the Environmental Protection Agency ("EPA") in the Office of Research and Development, Research Triangle Park, North Carolina ("RTP"), in April 2010. (Pl. Aff., DE # 72-2, ¶¶ 7, 8; Second Am. Compl., DE # 42, ¶¶ 13, 14.)[1] By that time, plaintiff had been rated 70% disabled by the Department of Veterans Affairs due to various injuries suffered during service, (Second Am. Compl., DE # 42, ¶¶ 22, 23), including chronic neck pain, debilitating back pain, chronic daily migraines, and cervical radiculopathy, (Pl. Aff., DE # 72-2, ¶ 29), and used a cane intermittently to assist with walking, (id. ¶¶ 23, 79). According to plaintiff, the EPA was aware of her disability rating when she was hired. (Id. ¶ 29.) In December 2010, she was reassigned

---

[1] Plaintiff verified the second amended complaint.

to work as a Human Resources ("HR") Specialist at Branch A, Human Resources Management Division ("HRMD"), also at EPA's RTP facilities. (Pl. Aff., DE # 72-2, ¶ 6; Second Am. Compl., DE # 42, ¶¶ 12, 13.) Plaintiff worked ten hours a day, four days a week, with a four-day weekend every other week to allow her to drive to her residence in Jacksonville, North Carolina every other weekend. (Pl. Aff., DE # 72-2, ¶¶ 13, 14.) Plaintiff maintained a second residence in Raleigh, North Carolina to permit her to work for the EPA. (Id. ¶ 4.)

In the summer 2011, Kathy Anthony, Chief, Branch A, and plaintiff's immediate supervisor; Corey Perry, a then-Senior HR Specialist at Branch A; and Henry Green, another co-worker, went to the site of plaintiff's new customer, the Office of the Chief Financial Officer ("OCFO"). (Anthony Dep., DE # 55-43, at 43-44, 117-19; Pl. Mem., DE # 72, at 6;[2] Second

---

[2] In response to defendant's motion for summary judgment, plaintiff filed an affidavit, certifying under penalty of perjury that:

> I, Elizabeth A. Merrill, depose and say that I am the Plaintiff in the above-entitled action; that I have read Plaintiff's Memorandum Of Law In Opposition To Defendant's Motion For Summary Judgment, and its Exhibits, and know the contents thereof; that the factual allegations set forth in the same are true and of my own knowledge, except for those allegations set forth upon information and belief, and as to those allegations, I believe them to be true.

(DE # 72-4.) As one court has recognized:

> This is a questionable practice, at best, in the context of a dispositive motion, as it converts the personal knowledge requirement of Rule 56(e)(1) [now 56(c)(4)] of the Federal Rules of Civil Procedure into a mere formality. Although the Court is certainly aware that lawyers routinely draft affidavits for their lay clients, the virtual circumvention of the personal knowledge requirement here by summary blanket adoption makes the Court's job of insuring the affiant is in fact competent to testify to all of the matters in the affidavit all the more difficult because the Court is forced to search the statements drafted by [the non-movant's] counsel in its brief and assume that all are based on the personal knowledge of a single witness.

Steel Strip Wheels, Ltd. v. Gen. Rigging, LLC, No. 08-CV-13737, 2009 WL 3190415, at *2 (E.D. Mich. Sept. 30, 2009); see also Ricks v. Xerox Corp., 877 F. Supp. 1468, 1470 n.1 (D. Kan. 1995) (disregarding the plaintiff's affidavit which read, "[Plaintiff] 'has read the foregoing Suggestions in Opposition to Motion For Summary Judgment and the responses and allegations are true and correct to the best of his knowledge and belief.'"), aff'd, 96 F.3d 1453 (10th Cir. 1996) (table). The problem is particularly compounded in this case. The statement of facts section of plaintiff's memorandum in opposition is nearly thirty-five pages long. Not surprisingly, plaintiff also weaves facts into her argument section, which is another twenty pages. Furthermore, none of the statements in the memorandum are qualified with "upon information and belief," as plaintiff's affidavit would lead one to conclude at least some should be. Additionally, many of the so-called facts are not really facts at all. (See, e.g., Pl. Mem., DE # 72, at 6 ("While another Branch A coworker, Deidre Oberbey [sic], states 'The major issue in our branch is Corey [Perry],' Overbey's personal opinion of 'I believe that Beth really dislikes her [Perry] . . .' is a misguided assumption." (citation omitted) (latter alteration and omission in original)); id. at 10 ("One would assume Anthony

Am. Compl., DE # 42, ¶ 6.)   OCFO was "angry," and the Branch A staff had to address some

issues.   (Anthony Dep., DE # 55-43, at 119.)   Upon the staff's "return, Green informed Plaintiff

that Perry had attributed the customer's [i.e., OCFO's] complaints to Plaintiff's inexperience."

(Pl. Mem., DE # 72, at 6.)   According to Anthony, plaintiff then had a different attitude towards

Perry, and "it . . . digressed from that point."   (Anthony Dep., DE # 55-43, at 119.)   However,

"[p]laintiff considered the incident 'water under the bridge.'"   (Pl. Mem., DE # 72, at 6.)

        In August 2011, Anthony documented an issue between plaintiff and Perry regarding

corrections to a transfer action for OCFO.   (Gov't Ex. 5, DE # 55-4.)   After speaking with both

plaintiff and Perry, Anthony noted, "This is the second time there has been a confrontation

between the two of them both which seem to show Beth [plaintiff] as the aggressor."   (Id.)

Plaintiff, Anthony, and Perry agreed to meet to discuss the issue.   (Id.)   In September 2011, the

three of them had a "'Team Enhancement' discussion."   (Gov't Ex. 6, DE # 55-5.)   Plaintiff

told Perry she thought they "'made a great team.'"   (Pl. Mem., DE # 72, at 8.)   Anthony

characterized the meeting as "successful."   (Gov't Ex. 6, DE # 55-5.)

        According to plaintiff, in February 2012, plaintiff told Anthony, "'I just want you to

know that my disability is getting worse.'"   (Pl. Dep., DE # 55-42, at 126; see also Pl. Aff., DE

# 72-2, ¶ 16.)   She stated, "'My migraines are getting worse, my pains are getting worse.'"   (Pl.

Dep., DE # 55-42, at 126.)   Plaintiff continued,

> "But I do want to ask that I feel my worst *per se* when I drive back from
> Jacksonville. If I could work from home the day after, then I can get through the
> pain and then I can come back to the office after that and continue on, but I'm just
> asking to be able to work from home one day a pay period just to help manage the

would have a very good reason to tall tale [tell a tall tale?] during her Deposition when Anthony stated that she
herself had experienced Plaintiff's finger-pointing.") (citation omitted).)   To the extent possible, the court has
attempted to cull the inadmissible portions of plaintiff's memorandum in opposition from those portions which are
based on personal knowledge.

> pain on the day after the drive because that's when my body is still trying to
> recover from the two-and-a-half hour drive."

(Pl. Dep., DE # 55-42, at 127; <u>see also</u> Pl. Aff., DE # 72-2, ¶ 16.)   Anthony said she would

discuss the issue with Arron Helm, Anthony's immediate supervisor.   (Pl. Dep., DE # 55-42, at

127; Second Am. Compl., DE # 42, ¶ 9; <u>see also</u> Pl. Aff., DE # 72-2, ¶ 16.)   Plaintiff

subsequently inquired of Anthony about Helm's decision.   (Pl. Dep., DE # 55-42, at 128; Pl.

Aff., DE # 72-2, ¶ 18.)   Anthony told plaintiff she had forgotten about it and would discuss it

with him shortly.   (Pl. Dep., DE # 55-42, at 128; Pl. Aff., DE # 72-2, ¶ 18.)   Plaintiff continued

to follow up with Anthony and got the same response, with the pattern continuing until

"probably April."   (Pl. Dep., DE # 55-42, at 128; <u>see also</u> Pl. Aff., DE # 72-2, ¶ 18.)

Anthony offers a different version of events.   She recalls casual conversations with

plaintiff about plaintiff's aches and pains and her having headaches and backaches.   (Anthony

Dep., DE # 55-43, at 130, 131, 211.)   She recalls plaintiff "mention[ing] something about her

headaches were getting worse" possibly "in the February time frame."   (<u>Id.</u> at 131; <u>see also</u> <u>id.</u> at

211.)   She believes she first spoke with plaintiff about teleworking around late April or early

May 2012.   (<u>Id.</u> at 130.)   Anthony does not recall why plaintiff said she was interested in

teleworking.   (<u>Id.</u> at 136.)   According to Anthony, plaintiff was interested in teleworking two

days a week, but Anthony encouraged her to try one day per week as a trial and increase it to two

days if it worked out.   (<u>Id.</u> at 135-36.)

In the meantime, at the beginning of February 2012, plaintiff was instructed to read the

"DE Handbook."   (Gov't Ex. 7, DE # 55-6.)   By the end of the month, plaintiff had not read the

manual, and Anthony met with her about the matter.   (<u>Id.</u>)   When plaintiff did finally finish, she

forgot to respond by email to indicate that she had done so, until Anthony reminded her, which

was at the beginning of March.   (Id.)   Anthony discussed with plaintiff that she felt a letter of warning for failing to read the manual was appropriate, but after discussing the matter with the Director, she decided against it.   (Id.)   Anthony told plaintiff she must respond to requests in the future.   (Id.)

Also, around this same time (the beginning of March 2012), Anthony documented more problems between plaintiff and Perry.   (Id.)   Anthony noted that she told plaintiff that she wanted her to work professionally with Perry and that "you two are even now and it's time to drop it and get along."   (Id.)

On 2 May 2012, Anthony provided plaintiff with an EPA Flexiplace[3] Application Package.   (Pl. Aff., DE # 72-2, ¶ 18.)   She instructed plaintiff to complete the forms, including checking the "Regular" box on the application form because "'Episodic' was for one time projects and 'Medical' was for a temporary medical condition."   (Id.)   Plaintiff applied for one telework day per week/pay period.   (DE # 57-4.)   Plaintiff returned the forms to Anthony on the same day.   (Pl. Aff., DE # 72-2, ¶ 18.)

Shortly thereafter, plaintiff was discussing teleworking and reasonable accommodation with a co-worker, who informed plaintiff she "may have completed the wrong forms."   (Pl. Aff., DE # 72-2, ¶ 20.)   Another co-worker who was currently teleworking as a reasonable accommodation, Yolanda Overbey, joined the conversation, and plaintiff showed her the package she had submitted to Anthony.   (Id.)   Overbey informed plaintiff she had completed the wrong package and explained to her the forms to complete.   (Id.)   She also advised plaintiff

---

[3] "Flexiplace" is an EPA policy that "provides employees the opportunity to work at a place other than the regularly assigned work site such as satellite locations or their residences."   (Gov't Ex. 11, DE # 55-10, at USA 03540.)   It is not for use with employees who have permanent medical conditions.   (Id.)

5

to speak with Michael Davis, a Local Reasonable Accommodation Coordinator ("LRAC").

(Id.)   On 22 May 2012, plaintiff took her completed reasonable accommodation request to Davis

for his review and advice.   (Id. ¶ 30.)   Davis advised her to designate Bill Haig, the EPA

National Reasonable Accommodation Coordinator ("NRAC"), to receive her medical

documentation.   (Id.)   On this same day, Anthony noted that plaintiff and Davis were "behind

closed doors," "lead[ing her] to believe that [plaintiff] was discussing [reasonable

accommodation] telework with him."   (DE # 72-3, at USA 09970.)[4]   Anthony further noted, "I

believe she already suspects her telework is not being approved and she is planning to submit a[]

[reasonable accommodation] request."   (Id.)

The following day, 23 May 2012, plaintiff submitted a Confirmation of Request for

Reasonable Accommodation Form to Anthony, requesting the accommodation of telework

because of chronic pain.   (DE # 57-6.)   That same day, Anthony issued plaintiff a Letter of

Warning, (Pl. Aff., DE # 72-2, ¶ 70), based on "unacceptable conduct" which occurred the prior

week, (Gov't Ex. 10, DE # 55-9).   The Letter reads in pertinent part:

> The purpose of this correspondence is to warn you of unacceptable conduct on
> your part which, if continued, could lead to more serious disciplinary action. The
> specific facts supporting this letter of warning are as follows:
> As your supervisor, I have noted a number of issues we need to address.
> I am deeply concerned about your responses at the end of last week's meeting. I
> pointed to our Commitment Board and asked you if you had written anything on
> the board and you said "No, I don't believe in it." I realize that I had "asked"
> people to write their commitments on the board but it was assumed that everyone
> would be willing to commit to something for the betterment of our team. With
> that intent, your answer implies that you are not interested in helping the team to
> improve. This is not acceptable. Better teamwork is vital to improving the work in
> our Branch.
> I asked if you would try to keep your hands in your lap when you were upset to
> avoid pointing fingers in peoples' faces and try to be more calm and less direct, to

---

[4] Because the Bates stamp number obscures the page number generated by cm/ecf, the court refers to the Bates stamp number.

avoid confrontation. You replied "No, I'm too old to change." This is not acceptable. You are expected to interact with your management and peers in a professional manner. Your actions are perceived as unprofessional and are not conducive to a healthy work environment. I am instructing you to refrain from pointing your fingers in people's faces and to take steps to avoid confrontation with others from this point forward.
I asked if you were willing to meet Corey [Perry] half way and your answer was "No." I stated that you were going to have to work with Corey or be reassigned. Your reply was "I'll resign first." and you left the room. This is yet another instance of your continuing unwillingness to work with Corey which we have discussed several times in the last year.

(Id.)   The letter went on to state it was not a formal disciplinary action.   (Id.)   It concluded with Anthony soliciting from plaintiff her "strategy to try to become a better team player."[5]   (Id.)

Also on 23 May 2012, Anthony denied plaintiff's Flexiplace telework application, with the reason stated as "conduct issues."   (Pl. Aff., DE # 72-2, ¶ 71; DE # 57-4.)

The timing of when all this information was exchanged is disputed.   According to plaintiff, she delivered the Confirmation of Request for Reasonable Accommodation Form to Anthony before she received the Letter of Warning and the denial of her Flexiplace application. (Pl. Mem., DE # 72, at 11.)   However, Anthony's notes reflect that plaintiff slipped a folder containing the Confirmation of Request for Reasonable Accommodation Form under Anthony's door about twenty minutes <u>after</u> the conclusion of the meeting at which Anthony had given plaintiff the Letter of Warning and disclosed she was not approving the telework agreement. (DE # 72-3, at USA 09969.)

On 6 June 2012, in regards to plaintiff's the Confirmation of Request for Reasonable Accommodation Form, Anthony emailed Haig, the NRAC, stating, "I am presently unaware of

---

[5]  On 30 May 2012, plaintiff responded to the Letter of Warning.   (Pl. Aff., DE # 72-2, ¶ 74.)

any work-related limitations for [plaintiff] so I have no way of knowing what we are attempting to accommodate" and requesting that medical information to support the request be obtained. (Gov't Ex. 13, DE # 55-12.)   On 11 June 2012, Haig issued an EPA Determination of Disability to plaintiff, Anthony, and Kathy Mills, another LRAC.   (Gov't Ex. 15, DE # 55-13.)   He determined that plaintiff "has a covered impairment that substantially limits the major life activity of the functioning of the neurological system" and "[s]he is therefore determined to be a person with a disability[.]"   (Id.)   He noted that the documentation he received from Dr. Ana Felix indicates plaintiff is sensitive to light and sound and experiences changes in her vision and sensory changes, such as "feeling of pins and needles in her extremities."   (Id.)   He stated,

> Dr. Felix indicates that the exacerbations are chronic and occur daily.   Dr. Felix suggests the following be considered:
> - Reduced noise, light and a quiet environment;
> - If possible, working from home which would allow Ms. Merrill to control her immediate environment in a direct and efficient fashion.

(Id.)   He then recommended that plaintiff and Anthony, as the decisionmaker, meet to discuss what accommodations, if any, may be effective; noted that any reasonable accommodation offered shall address the limitations described; and recognized that "[i]f the implemented accommodations are determined to be ineffective the [decisionmaker] shall consider other accommodations that may be effective."   (Id.)

On 13 June 2012, plaintiff and Anthony met at which time Anthony informed plaintiff she was declining the telework request and offering nine other accommodations.   (Gov't Ex. 16, DE # 55-14.)   Anthony's notes indicate that she did not approve telework because (1) the physician requested consideration of telework but did not require it and (2) she (Anthony) "need[s] to achieve a comfort level regarding the recent conduct issue."   (Id.)   The

8

accommodations Anthony approved were:

> -Ability to move about as needed (to take short breaks/walks during regular work
> hours)
> -Change in office lighting
> -White noise installation (switch controlled) to help block outside noise
> -Keep door closed to limit distractions ·
> -Install sound proofing in ceiling tiles to limit noise
> -Purchase and install non-glare screens for monitors
> -More flexibility in daily schedule (later arrival time with option to work later or
> make up time as long as there is no OT)
> -On-the-Spot leave approval as needed
> -Ergonomic assessment of work space

(Gov't Ex. 17, DE # 55-15.)

According to plaintiff, she "accepted and fully cooperated with these nine alternative 'accommodations.'" (Pl. Aff., DE # 72-2, ¶ 46.) However, she admits that she did not attempt to use non-glare screens as she had tried them previously and they "actually made the situation worse." (Id.) She further claims that she "informed Anthony on numerous times that the 'alternative accommodations' were not helping [her] disability[.]" (Id. ¶ 50; see also Pl. Mem., DE # 72, at 17.) According to plaintiff, she was not allowed to use the "move about as needed" accommodation during meetings or trainings, (Pl. Mem., DE # 72, at 14), and Anthony told her not to keep her door closed "too much" so others would not think she was unapproachable, (id. at 15). Other accommodations were not implemented until 2013. (Id.) On 26 June 2012, plaintiff filed an informal administrative complaint of discrimination based on disability and shortly thereafter requested mediation. (Second Am. Compl., DE # 42, ¶¶ 56, 57.) In July 2012, plaintiff began using a cane consistently. (Pl. Aff., DE # 72-2, ¶ 79.) On 1 August 2012, the parties attempted mediation, specifically directed at telework as an accommodation. (Second Am. Compl., DE # 42, ¶¶ 58, 59.) It was unsuccessful. On 14 August 2012, Anthony

emailed plaintiff stating, in part, "I am sorry that we were unable to resolve your request for reasonable accommodation through the mediation process. However, I remain committed to working with you to explore effective accommodations." (Gov't Ex. 19, DE # 55-17.) She went on to outline the accommodations already put in place and those that the EPA continued to work on, encouraging plaintiff to offer any suggestions regarding these items. (Id.) She offered to order plaintiff a new office chair in light of the ergonomic assessment of plaintiff's workspace. (Id.) Also, Anthony noted that plaintiff recently indicated that she had updated medical documentation relevant to her request for reasonable accommodation and that plaintiff intended to provide it to her (Anthony) in redacted form. (Id.) Anthony informed plaintiff that she must submit the updated information to Haig because plaintiff had authorized only him to receive and evaluate her medical documentation. (Id.)

On 14 September 2012, plaintiff filed a formal administrative complaint of discrimination based on disability. (Second Am. Compl., DE # 42, ¶ 61.)

In the latter part of 2012, plaintiff was permitted to call into meetings from her office because the cold temperature in the conference room exacerbated her pain. (Pl. Aff., DE # 72-2, ¶ 49.) On 27 November 2012, Anthony informed plaintiff via email that in the future she would be required to attend in person all local mandatory meetings. (Gov't Ex. 21, DE # 55-18.) Anthony stated,

> You have said you cannot physically attend these meetings because you get too cold. As part of the Reasonable Accommodation process, you can make a request for an additional accommodation and we can work collaboratively through the interactive process.
> In the meantime, perhaps some advance planning in wearing warmer clothing, a jacket or taking a blanket may help.

(Id.) Plaintiff responded, "To clarify, what I said was that I was in too much pain. I would also

10

like to clarify that your suggestion of 'wearing warmer clothing, a jacket or taking a blanket' does not aid in decreasing pain." (Id.) To which Anthony inquired of plaintiff, "Are you requesting an accommodation?" (Id.) According to plaintiff, after this email, she went to Anthony's office and discussed with Anthony why she was required to submit more documentation when she considered it part of her original accommodation. (Pl. Dep., DE # 55-42, at 170.)

At some unspecified time, Anthony would not permit plaintiff to use a space heater in plaintiff's office or permit the installation of a controllable thermostat in plaintiff's office. (Pl. Mem., DE # 72, at 18.)

On 12 December 2012, Anthony issued plaintiff a Letter of Reprimand for "improper conduct." (Gov't Ex. 25, DE # 55-22.) The Letter outlined plaintiff's failure to respond to two 4 December 2012 emails from Perry and a 5 December 2012 interaction between Perry and plaintiff in plaintiff's office during which plaintiff shut her office door while Perry was talking to her (presumably as Perry stood in the doorway). (Id.) The Letter also cited plaintiff's development of a "pattern of selectively disregarding" Anthony's emails requesting information. (Id.) It advised plaintiff "that further occurrences of improper and/or unprofessional conduct could result in the imposition of more stringent disciplinary action up to and including [] removal from Federal service." (Id.) A copy of the Letter was placed in plaintiff's personnel folder. (Id.) Plaintiff denies that she inappropriately closed the door while Perry was talking to her. (Pl. Aff., DE # 72-2, ¶ 80.)

On 9 July 2013, Anthony changed plaintiff's timecard from Jury Duty status to AWOL status as a result of an investigation Anthony took into plaintiff's actions surrounding a summons

for jury service for the three-week period starting 11 March 2013. (Id. ¶¶ 83, 87; Gov't Ex. 26, DE # 50-1, at 86.) Two days later, Anthony issued plaintiff a Notice of Proposed Suspension from pay and duty for fourteen days. (Gov't Ex. 26, DE # 50-1.) The Notice charged plaintiff with (1) absence without leave for the period 11 March through 15 March 2013 related to the jury service issue; (2) two instances of lack of candor (both related to the jury service issue) at the end of March 2013; and (3) eleven instances of failure to follow instructions from April 2013 through 1 July 2013. (Id. at 11-14.) Plaintiff was warned that "any further instances of this type will neither be tolerated nor condoned," and advised that additional acts of misconduct could result in discipline including removal from service. (Id. at 17.) After receiving plaintiff's written reply to the proposed suspension, Suzanne Roberts, Director, HRMD, determined that all the charges were supported, with the exception of one instance of failure to follow instructions, and upheld the proposed suspension. (Gov't Ex. 28, DE # 55-24.) After plaintiff met with the Chief of Staff and after also meeting with Peter Johnson, Director, Office of Administration and Resources Management-RTP, Johnson refused to reverse Roberts's decision. (Pl. Aff., DE # 72-2, ¶ 107.) Plaintiff disputes the charges related to the jury service issue and several of the instances of failure to follow instructions. (See Pl. Aff., DE # 72-2, ¶¶ 83-104; Pl. Aff., DE # 102-3, Pl. Aff., DE # 102-5.)

On 9 September 2013, plaintiff submitted a second Confirmation of Request for Reasonable Accommodation Form. (Gov't Ex. 29, DE # 55-25.) Plaintiff requested full-time telework based on chronic neurological pain. (Id.)

On 6 January 2014, plaintiff filed this action.

On 8 January 2014, after receiving additional medical documentation from Dr. Felix,

Haig emailed plaintiff, Anthony, and Mills, summarizing that documentation:

> Ms. Merrill's current functional limitations include disabling headaches, back, neck and shoulder pain. These fluctuate in intensity and severity. One of the triggers for her severe headaches include environmental conditions such as lighting and noise. In addition she has limitations walking long distances (undefined) due to chronic lower back pain and requires the use of a cane at times. She is able to sit for short periods of time (undefined), requiring repositioning or movement to limit lower back, shoulder and back pain. Major negative effects of mitigating measures include the need to take time for doctor's appointments, physical therapy appointments and the need to take medication in a timely manner. Some mitigating measures used cause sedation, but her treatment regimen is such that she adheres to the regimen in the evening and therefore has not been affected by this sedation side effect. Dr. Felix makes the following suggestions: Once her headaches begin her symptoms improve if she is able to utilize her mitigating measures immediately and reduce her environmental triggers, which are not in her control in her workplace environment, but are in her control in her home office. Dr. Felix respectfully requests that the Agency consider making accommodation for Ms. Merrill, who reports increased functionality, efficiency and ability to complete her work, provided she can control her physical environment, which is impossible in her office setting, but possible in her home office setting.

(Gov't Ex. 34, DE # 55-30.)   Haig recommended that plaintiff and Anthony meet to discuss what accommodations, if any, may be effective.   (Id.)   On 21 January 2014, plaintiff, Anthony, and Mills met.   (Gov't Ex. 36, DE # 55-32.)   Plaintiff informed Anthony that none of the accommodations provided have worked.   (Id.)   Anthony suggested other options, such as moving to a more remote office and taking a longer lunch to go home and rest.   (Id.)   Plaintiff said the suggestions would not work.   (Id.)   Mills asked plaintiff, "'[W]hat would remove the workplace barrier so she could work effectively[?]'"   (Id.)   Plaintiff responded that she could not think of anything that would help.   (Id.)

On 25 February 2014, plaintiff, Anthony, and Mills met again.   (Gov't Ex. 38, DE # 55-34.)   Plaintiff stated she did not understand why Anthony would not allow her to telework as she can control her pain much better in a home environment.   (Id.)   Mills asked plaintiff what was it

13

in her home that made it easier to control her pain.   (Id.)   Plaintiff "responded that she was not willing to discuss it and that it was personal."   (Id.)   Mills explained that telework was not "off the table" but they were trying to find the best accommodations.   (Id.)   Anthony went over the new accommodations plaintiff was being provided: removal of foam boards on her office windows; relocation of branch gathering place away from the vicinity of plaintiff's office; purchasing and installing all-in-one copier/printer/scanner; designating an assistant to help plaintiff with mass copying; and allowing plaintiff to make up sick leave time on compressed days.   (Id.; Gov't Ex. 39, DE # 55-35.)   The accommodations were to "be reevaluated after 60 days to determine effectiveness during which time the [decisionmaker] will continue to seek additional accommodations for the employee."   (Gov't Ex. 39, DE # 55-35.)

On 6 March 2014, another incident occurred between plaintiff and Perry in plaintiff's office involving the closing of the door.   According to Perry, Perry went to plaintiff's office to speak with her about a task Perry wanted plaintiff to complete by hand as plaintiff's computer had been turned in for a software update.   (Gov't Ex. 43, DE # 51-1, at USA 15522.)   Plaintiff smacked the document Perry had given her onto a stack of papers and said, "'[W]hatever!'"   (Id. at USA 15523.)   Plaintiff "then proceeded to use her foot to shut the door in [Perry's] face" and Perry responded by asking plaintiff "if she was really shutting the door in [her] face again."   (Id. (emphasis removed))   Perry recounted the incident to Anthony the same day and characterized plaintiff's behavior as a continuation of "the pattern of Beth either being nasty, rude, and defiant or just failing to complete assignments altogether that I task her with."   (Id.)

Plaintiff claims Perry's tone was "hostile," (Pl. Aff., DE # 72-2, ¶ 115), and plaintiff denies that she shut the door on Perry.   Rather, she claims it was Perry who started to close the

door, then Perry shoved it back open causing plaintiff to almost fall out of her chair and injure her shoulder.   (Id. ¶¶ 116, 117.)   Plaintiff claims that Perry yelled at plaintiff "not to close the door on her again" and was not sanctioned for her conduct.   (Id. ¶ 116.)   On 24 March 2014, plaintiff filed a workers' compensation claim based on the incident.   (Id. ¶ 118.)

In the meantime, on 11 March 2014, Helm replaced Anthony as the decisionmaker for plaintiff's reasonable accommodation issues, according to Anthony, to "provide a fresh set of eyes and a new perspective for the interactive process."   (Gov't Ex. 40, DE # 55-36.)   On 6 May 2014, Haig emailed plaintiff, Helm, and Davis, notifying them that he had received additional medical information from Dr. Felix on 22 April 2014, summarizing the pertinent information, as follows.   (DE # 82-6.)

> The diagnosed neurological condition has been associated with chronic neck and back pain. An injury that Ms. Merrill states occurred at work in March to her right shoulder has triggered worsening neck pain and headaches. A person who suffers with the diagnosed condition can have their symptoms aggravated or triggered by environmental factors such as smells, light, sounds as well as stressful environments. Symptoms can be alleviated at times by immediate removal or avoidance of triggers, along with medication. This requires the ability to control one's immediate environment, which Ms. Merrill informs (Dr. Felix) that she is unable to do. Dr. Felix makes the following suggestion:
> - While I have no medical opinion regarding the type of work or the feasibility of working remotely, I do support her request to do so.

(Id.)   Haig suggested that plaintiff and Helm "meet to discuss the additional medical information and assess the effectiveness of the accommodations that were implemented in February, 2014."

(Id.)   On 12 June 2014, Haig again emailed Helm, stating that he had not heard back from Helm.

(Id.)   Helm responded by email to Haig, stating that he had been out of the office for the entire month of May and that on 9 June he had sent an email to plaintiff to schedule a meeting.   (Id.; see also Gov't Ex. 41, DE # 55-37.)   On 19 June 2014, plaintiff, Helm, and Davis met and

15

discussed the status of the accommodations that had been previously granted and plaintiff's functional limitations.   (Gov't Ex. 41, DE # 55-37.)

Later that same day, Anthony issued plaintiff a Notice of Proposed Removal.   (Gov't Ex. 43, DE # 51-1.)   The Notice charged plaintiff with (1) three instances of unprofessional conduct, two of which related to the 6 March 2014 incident with Perry; (2) three instances of lack of candor, one of which related to plaintiff's workers' compensation claim based on the incident with Perry; (3) four instances of failure to follow instructions; and (4) two instances of failure to follow leave procedures.   (Id. at USA 15513-15.)   The instances charged span from 18 November 2013 through 8 April 2014.   (Id.)

On 26 June 2014, plaintiff responded to each charge.   (DE # 72-3, at 169-87.)   On 15 August 2014, Anthony apparently mailed to plaintiff a document missing from the attachments to the Notice of Proposed Removal.   (See Gov't Ex. 46, DE # 55-41, at USA 15787.)   Plaintiff was given until 27 August 2014 to respond to the document, which she did via email.   (Id.)   On 15 September 2014, Roberts issued her decision to remove plaintiff from service effective 20 September 2014.   (Id. at USA 15800.)

On 27 October 2014, plaintiff filed her second amended complaint alleging that defendant violated Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, for failure to provide reasonable accommodation and based on retaliation and hostile work environment.   (DE # 42.)

II.     DISCUSSION

 "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'"   Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)

16

(citation omitted).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion."  Rossignol, 316 F.3d at 523 (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

A.     Failure to Accommodate Claim

Section 501 of the Rehabilitation Act "provide[s] for employment of disabled individuals by federal departments, agencies, and instrumentalities and the formation of affirmative action plans in federal employment."  Jones v. Am. Postal Workers Union, Nat'l, 192 F.3d 417, 428 (4th Cir. 1999); see also 29 U.S.C. § 791.  It incorporates the standards of Title 1 of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*, as to complaints alleging non-affirmative action discrimination.  29 U.S.C. § 791(f); see also 29 C.F.R. § 1614.203(b). The Act "prohibits discrimination on the basis of disability in employment decisions by the Federal Government."  Lena v. Pena, 518 U.S. 187, 193 (1996); see also 29 C.F.R. § 1630.4(a)(1) (making disability discrimination unlawful regarding an array of job-related activities); 42 U.S.C. § 12112(a) (prohibiting disability discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment"). Discrimination under the Act includes failure to accommodate a known disability of an

otherwise qualified individual. See 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. §§ 1630.4(a)(2), 1630.9(a). "'[Q]ualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds . . . and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

Reasonable accommodation is modifications or adjustments to the work environment "that enable an individual with a disability who is qualified to perform the essential functions of that position" or "that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." Id. § 1630.2(o)(1)(ii), (iii). "In order to be reasonable, the accommodation must be effective (i.e., it must address the job-related difficulties presented by the employee's disability), and it must allow the employee to attain an 'equal' level of achievement, opportunity, and participation that a non-disabled individual in the same position would be able to achieve." Fleetwood v. Harford Sys. Inc., 380 F. Supp. 2d 688, 699 (D. Md. 2005) (citation omitted); see also 29 C.F.R. pt. 1630, app. § 1630.9 (2014) ("The reasonable accommodation that is required by this part should provide the individual with a disability with an equal employment opportunity. Equal employment opportunity means an opportunity to attain the same level of performance, or to enjoy the same level of benefits and privileges of employment as are available to the average similarly situated employee without a disability.").

In order to prevail on a reasonable accommodation claim under the Rehabilitation Act, [plaintiff] would have to prove (1) she was an individual with a disability in the name of the ADA; (2) the [agency] had notice of her disability; (3) with reasonable accommodation, [plaintiff] could perform the essential functions of the position; and (4) the [agency] refused to make such accommodation.

Works v. Colvin, 519 F. App'x 176, 186 (4th Cir. 2013) (citing Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). "Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." Haneke v. Mid-Atl. Capital Mgmt., 131 F. App'x 399, 400 (4th Cir. 2005) (citing 29 C.F.R. § 1630.2(o)(3)).

> The ADA imposes upon employers a good-faith duty "to engage [with their employees] in an interactive process to identify a reasonable accommodation." This duty is triggered when an employee communicates her disability and desire for an accommodation— even if the employee fails to identify a specific, reasonable accommodation. However, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position.

Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 581 (4th Cir. 2015) (citations omitted) (alteration in original). As part of the interactive process, the employer should:

> (1) Analyze the particular job involved and determine its purpose and essential functions;
> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position;[6] and
> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

29 C.F.R. pt. 1630, app. § 1630.9. It is important to note that while the employer should consider the disabled employee's preference, the selection of a reasonable accommodation is

---

[6] "Although this process is described [] in terms of accommodations that enable the individual with a disability to perform the essential functions of the position held or desired, it is equally applicable . . . to accommodations that enable the individual with a disability to enjoy equal benefits and privileges of employment." 29 C.F.R. pt. 1630, app. § 1630.9.

within the employer's discretion.   Id.; see also Reyazuddin v. Montgomery Cty., Md., 789 F.3d 407, 415 (4th Cir. 2015) ("An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested.   Rather, the employer may provide an alternative reasonable accommodation." (citation omitted)).

Turning to this case, for purposes of its motion, defendant assumes that plaintiff can satisfy the first and second elements of a failure to accommodate claim, that is, she is an individual with a disability within the meaning of the statute and the EPA had notice of the disability.   (Def. Mem., DE # 48, at 23.)   Regarding the third element—with reasonable accommodation, plaintiff could perform the essential functions of her position—defendant contends that plaintiff's admission that she could perform all the essential functions of her position *without* reasonable accommodation is fatal to her claim.   Plaintiff does acknowledge that she is "able to perform the essential functions of her position, either with or without the accommodation sought."   (Second Am. Compl., DE # 42, ¶ 34; see also Pl. Mem., DE # 54, at 8 ("The record shows that Plaintiff was performing the essential functions of her position, even without reasonable accommodation . . . ." (citations omitted)); Sawyer-Little Rpt., DE # 75-5, at 12 ("There is no question that Ms. Merrill could perform the essential functions of the position. She was performing the essential functions of her position without the requested accommodation of teleworking.").)   As recognized previously, the Rehabilitation Act protects a "qualified" individual with a disability, that is, (1) the individual possesses the necessary education, skills, and other prerequisites for the position and (2) the individual can perform the essential functions of the position *with or without* reasonable accommodation.   29 C.F.R. § 1630.2(m); see also 29 C.F.R. pt. 1630, app. § 1630.2(m) ("The determination of whether an individual with a disability

is 'qualified' should be made in two steps.")   The purpose of the requirement that an individual is able to perform the essential functions of her job (with or without accommodation) "is to ensure that individuals with disabilities who can perform the essential functions of the position held . . . are not denied employment opportunities because they are not able to perform marginal functions of the position."   29 C.F.R. pt. 1630, app. § 1630.2(m).   There is no dispute that plaintiff, a disabled individual, possessed the necessary credentials for her position and that she could perform the essential functions of the position without accommodation, and thus, she is a "qualified" individual within the meaning of the statute.

Even though plaintiff is subject to the protections of the Rehabilitation Act, defendant argues that it is not required to provide plaintiff reasonable accommodation because she can perform her essential job duties without any accommodation.   The court concludes that defendant perceives its obligations too narrowly.   To be sure, an employer has a duty to provide reasonable accommodations that enable a disabled employee to perform essential job functions. 29 C.F.R. § 1630.2(o)(1)(ii).   But, that is not the employer's only duty.   If the employee needs reasonable accommodation to enable her "to enjoy equal benefits and privileges of employment," the employer is obligated to provide it as well.   Id. § 1630.2(o)(1)(iii); see also Scalera v. Electrograph Sys., Inc., 848 F. Supp. 2d 352, 366 (E.D.N.Y. 2012) (in failure to accommodate case based on failing to provide higher toilet seat and hand rail at entrance for disabled employee, recognizing that reasonable accommodations are not limited to those related to essential job functions); Loya v. Sebelius, 840 F. Supp. 2d 245, 261 (D.D.C. 2012) ("Providing a reasonable accommodation that is necessary to enable a disabled employee to perform the essential functions of her job may be the *minimum* that a federal agency is required

to do, but there is no statutory or regulatory basis on which to conclude that it is never required to do more. In other words, 'the fact that plaintiff could do [her] job without any accommodation does not in and of itself disqualify [her] from ever requesting or receiving an accommodation.'" (citations omitted) (emphasis in original)); <u>EEOC v. Life Techs. Corp.</u>, Civil Action No. WMN-09-2569, 2010 WL 4449365, at *4 (D. Md. Nov. 4, 2010) ("This regulation[, 29 C.F.R. § 1630.2(o)(1)(iii),] requires employers to make modifications and adjustments, not just to minimally permit disabled employees to do their job, but also to permit them to enjoy all of the 'benefits and privileges' of the job as would any other employee."). While the fact that plaintiff could perform essential job duties without accommodation might bear on the reasonableness of telework as an accommodation, it does not defeat her failure to accommodate claim outright.[7]

Next, each party claims entitlement to summary judgment on the issue of reasonableness of accommodation. Defendant contends all the accommodations it offered were reasonable, while plaintiff asserts that none of them were effective and telework was the only reasonable

---

[7] Some courts have identified being a "qualified" individual as a distinct element of a failure to accommodate claim. <u>See, e.g.</u>, <u>Enica v. Principi</u>, 544 F.3d 328, 338 (1st Cir. 2008) ("In order to assert a claim for failure to accommodate under the Rehabilitation Act, [the plaintiff] must establish that she (1) suffers from a 'disability' within the meaning of the statute, (2) is a qualified individual inasmuch as she is able to perform the essential functions of her job, with or without reasonable accommodation, and (3) that, despite its knowledge of her disability, the VA did not offer a reasonable accommodation." (citation omitted)); <u>Winfrey v. City of Chicago</u>, 259 F.3d 610, 614 (7th Cir. 2001) ("To establish a claim for failure to accommodate under the ADA or the Rehabilitation Act, the plaintiff must demonstrate that he or she is a disabled person as defined by the statute, that the employer knew about the disability and that he or she is otherwise qualified to perform the essential functions of the job sought, with or without reasonable accommodation." (citation omitted)); <u>Lewis v. Gibson</u>, No. 1:12CV1189, 2014 WL 7151737, at *8 (M.D.N.C. Dec. 15, 2014) ("Thus, a prima facie claim of disability discrimination for failure to accommodate is established when a plaintiff shows (1) he is disabled within the meaning of the ADA or Rehabilitation Act, (2) his employer was aware of the disability, (3) the plaintiff was a qualified individual who could perform the essential functions of his position with or without accommodation, and (4) his employer failed to provide such reasonable accommodations." (citing <u>Rhoads</u>, 257 F.3d at 387 n.11)), <u>aff'd</u>, 621 F. App'x 163 (4th Cir. 2015), <u>cert. denied</u>, 136 S. Ct. 840 (2016).

accommodation.   To survive summary judgment on this issue, plaintiff is "required to present evidence from which a jury may infer that the [proposed] accommodation is reasonable on its face, i.e., ordinarily or in the run of cases.   A reasonable accommodation is one that is feasible or plausible."   Reyazuddin, 789 F.3d at 414 (citations and internal quotation marks omitted) (alteration in original).   Reasonableness is gauged objectively.   Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 350 (4th Cir. 1996).   "Generally, the question of whether a proposed accommodation is reasonable is a question of fact."   Buskirk v. Apollo Metals, 307 F.3d 160, 170 (3d Cir. 2002) (citation omitted); see also Reyazuddin, 789 F.3d at 416 (recognizing that whether an accommodation provided was reasonable is a question of fact).

Telework is certainly contemplated as a viable accommodation in certain circumstances. See Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Notice No. 915.002, 2002 WL 31994335, at *24 (Oct. 17, 2002); Work at Home/Telework as a Reasonable Accommodation, https://www.eeoc.gov/facts/telework.html (last visited 11 April 2016).   In fact, defendant does not dispute that the EPA has provided telework as a reasonable accommodation to other employees.   (Def. Reply, DE # 98, at 2 n.1.)

Whether or not it is reasonable for plaintiff is another issue.   Plaintiff certainly requested telework to accommodate her disability.   At a minimum, her treating physician recommended that plaintiff be allowed to telework as an accommodation.   According to plaintiff's expert, a rehabilitation consultant, "allowing Ms. Merrill to telework on a full-time basis was the only accommodation that would have adequately addressed [her] unique needs or reasonably accommodate her disability."   (Sawyer-Little Rpt., DE # 75-5, at 12.)   On the other hand,

defendant's expert, a neurologist, opines that telecommuting for a person in the midst of an acute headache is more appropriate for use on an occasional basis.[8] (Collins Rpt., DE # 50, at 2.) He further states that he has never recommended full-time telecommuting as an accommodation and "would typically recommend that a patient whose migraines are disabling to that extent apply for permanent disability." (Id.)

Disagreement also exists about whether the alternative accommodations the EPA offered were reasonable. According to plaintiff, none of them was effective. Her expert opines that "[t]he alternative accommodations offered by EPA failed to adequately address Ms. Merrill's unique needs or reasonably accommodate her disability." (Sawyer-Little Rpt., DE # 75-5, at 12.) Defendant's expert opines that "the work accommodations to decrease environmental factors such as bright lights and loud noises are reasonable and appropriate accommodations," and states, "In my experience the accommodations offered by the EPA for Ms. Merrill met or exceed the accommodations I have recommended for headache patients." (Collins Rpt., DE # 68, at 2.)

Further disagreement surrounds the parties' respective actions during the interactive process. Disputed factual issues to be resolved include the extent of plaintiff and Anthony's discussion in February 2012 and whether Anthony should have treated plaintiff's request to telework one day per pay period as one for reasonable accommodation of a disability; the EPA's consideration of telework as an accommodation; the EPA's responsiveness (or lack thereof) to

---

[8] Plaintiff argues that the court should "discount" this defense expert report in "its entirety" for several reasons, including that "[t]he report focuse[s] only on migraines, which is just one of Plaintiff's disabilities." (Pl. Mem., DE # 54, at 18-19.) The reasons plaintiff advances go not to the consideration of the report but to the weight to be given it, and accordingly, the court will not disregard it. See Rutherford Controls Int'l Corp. v. Alarm Controls Corp., No. 3:08-CV-369-HEH, 2009 WL 5872896, at *1 (E.D. Va. Oct. 15, 2009) ("[T]he adequacy of an expert's knowledge goes to the weight of the testimony, which is a jury question, and not to its admissibility." (citation omitted)).

24

plaintiff's requests for accommodation and notifications that the accommodations provided were not working; the effect of plaintiff's failure to submit updated medical documentation until her second request for accommodation in September 2013; and plaintiff's refusal to discuss with Anthony and Mills what in her home made it easier to control her pain. All these issues are ones of material fact which preclude the court from holding either party is entitled to judgment as a matter of law on the issue of whether defendant refused to make reasonable accommodation for plaintiff, and therefore, the court will deny the cross-motions for summary judgment on plaintiff's failure to accommodate claim.[9]

B.     Retaliation Claim

The Rehabilitation Act bars retaliation "against any individual because such individual has opposed any act or practice made unlawful by [the ADA or the Rehabilitation Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA or Rehabilitation Act]." 42 U.S.C. § 12203(a); see also 29 U.S.C. § 791(f) (Rehabilitation Act's incorporation of the ADA's standards); Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001) (recognizing that the Rehabilitation Act incorporates the ADA's anti-retaliation provision).

> To prevail on a retaliation claim, a plaintiff must either provide sufficient direct and indirect evidence of retaliation, or proceed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *Cf. Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001).

> Under the former avenue, a plaintiff must produce direct or indirect evidence of a "stated purpose to discriminate . . . of sufficient probative force to reflect a

---

[9] In light of these factual disputes, the court does not reach the issue of plaintiff's entitlement to summary judgment on the defense of undue hardship, see 29 C.F.R. § 1630.15(d) ("It may be a defense to a charge of discrimination, as described in § 1630.9, that a requested or necessary accommodation would impose an undue hardship on the operation of the covered entity's business."), which defendant raised in its answer but on which it does not seek summary judgment.

genuine issue of material fact." *Rhoads*, 257 F.3d at 391 (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999)). "What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* at 391–92 (quoting *Brinkley*, 180 F.3d at 607).

Under the latter, a plaintiff must first establish a prima facie case of retaliation by demonstrating "(1) that he engaged in a protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action." *King v. Rumsfeld*, 328 F.3d 145, 150–51 (4th Cir. 2003). If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory basis for the action. *See Laing v. Fed. Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Notably, when the defendant proposes such a basis, "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Id.* at 722 (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000)). If the defendant meets this burden, the plaintiff must show that the proffered reason is pretextual. *See id.* at 719. While not necessarily required, comparator evidence—"evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably"—is "'especially relevant' to a showing of pretext." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. 1817).

Lewis v. Gibson, 621 F. App'x 163, 165 (4th Cir. 2015), cert. denied, 136 S. Ct. 840 (2016).   At all times, however, the ultimate burden of "establish[ing] that . . . her protected activity was a but-for cause of the alleged adverse action by the employer" remains with the plaintiff.   Univ. Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013); see also Gentry v. E.W. Partners Club Mgmt. Co., No. 14-2382, ___ F.3d ___, 2016 WL 851673, at *5 (4th Cir. Mar. 4, 2016) (holding "but-for" causation standard applies to claims governed by the ADA).

Plaintiff suggests that "email exchanges" evidence the EPA's intent to retaliate against her, and thus, the court need not reach the McDonnell Douglas burden-shifting analysis.   (Pl. Mem., DE # 72, at 55.)   According to plaintiff, from the beginning of her seeking reasonable accommodation, the EPA wanted to terminate her.   In support of this theory, plaintiff

26

references, without any explanation, the declaration and report of her expert Dr. Linsey C. Willis and the documents referenced in Dr. Willis's declaration and report, which span nearly 1100 pages.   By separate order, the court has excluded Dr. Willis's declaration and report.   (DE # 110.)   The only email relied upon by Dr. Willis which plaintiff characterizes as an "exchange" is one on 22 May 2012 from Anthony to Helm.   (Pl. Mem., DE # 72, at 46 n.15.)   On 22 May 2012, Helm emailed Anthony, Angelal Lewis, and Velda Holmes, copying Ramona Litowsky,[10] as follows:

> Please address this today since I do not have the package, and I want to ensure that this is conveyed as a united management decision, not just my/Ramona's. Given the attitude and conduct issues we've been told about this really should not have made it to us for consideration.

(DE # 97-1, at USA 30634.)   That same day, Anthony responded by email to Helm, copying Litowsky:

> Arron, I am sorry for putting you on the spot.   I see that Beth emailed you directly.   I had already told her last week that it was in the Immediate Office for approval so I thought it would be ok to say that.   I didn't realize she was going to email you.
> This is why I wanted to send an email about the telework because I know she is going to challenge it but I do understand now that I should be presenting decisions from a more "united management front" and will take that course in the future.
> And I do understand that I should have retrieved the agreement from you last week after the incident.
> I realize I have a lot to learn and I'm so sorry -- this is one lesson learned.
> I will try to get something to her today as soon as Velda and I discuss but the letter won't be ready today per Angela[l].

(Id.)   These emails appear to be regarding the Flexiplace Application Package plaintiff submitted to Anthony on 2 May 2012 as well as plaintiff's conduct which occurred during the week prior to 22 May 2012 and which is referenced in the 23 May 2012 Letter of Warning.

---

[10]  According to plaintiff, Litowsky was the Acting Deputy Director.   (Pl. Mem., DE # 72, at 10.)

While the email exchange might be relevant to plaintiff's failure to accommodate claim, its does not bear on defendant's intent to retaliate against plaintiff for having requested telework such that one might infer retaliation. Therefore, the court is left to analyze plaintiff's retaliation claim under the <u>McDonell Douglas</u> framework.

As for the first element of a *prima facie* case of retaliation, the parties agree that plaintiff engaged in protected activity by submitting the Confirmation of Request for Reasonable Accommodation on 23 May 2012 and filing an informal administrative complaint of discrimination on 26 June 2012. (<u>Compare</u> Pl. Mem., DE # 54, at 20-21 <u>with</u> Def. Mem., DE # 48, at 33; Def. Mem., DE # 67, at 21.) Because "federal anti-retaliation provisions generally prohibit conduct taken in retaliation for any protected activity, not just a plaintiff's initial protected activity," <u>Alvarado v. Donahoe</u>, 687 F.3d 453, 463 (1st Cir. 2012) (citation omitted), plaintiff's filing of a formal administrative complaint of discrimination on 14 September 2012, submission of a second Confirmation of Request for Reasonable Accommodation on 9 September 2013, and filing of this action on 6 January 2014 constitute separate forms of protected activity.[11] Accordingly, plaintiff has satisfied the first element of a *prima facie* case.

With regard to the second element, an adverse employment action is one "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a

---

[11] Plaintiff suggests that her 28 June 2012 request for mediation, her participation in mediation between 1 and 14 August 2012, the amended administrative charge filed 18 December 2012, and subsequent amendments (unspecified dates) to the administrative charge are also protected activities. (<u>See</u> Pl. Mem., DE # 72, at 50-51.) These activities were part of the then-ongoing administrative process, either informal or formal. As such, the court does not deem them separate and distinct protected activities from the filing of the informal and formal administrative charges. At any rate, the specified dates on which these additional activities occurred in relation to the adverse employment actions does not alter the court's analysis about plaintiff's *prima facie* case of causation, discussed *infra*.

charge of discrimination.'"" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citation omitted). Defendant does not dispute that plaintiff suffered adverse employment actions with her suspension and termination. (Def. Mem., DE # 48, at 33; Def. Mem., DE # 67, at 21.) Defendant does, however, contest whether the Letter of Warning and the Letter of Reprimand constitute adverse employment actions. It is true that "[c]ourts within the Fourth Circuit have generally found that actions which essentially amount to criticism of an employee such as negative performance evaluations, reprimands or warnings, and counseling are alone insufficient to constitute materially adverse employment actions under the *Burlington* standard." Christy v. City of Myrtle Beach, No. 4:09-CV-1428-JMC-TER, 2011 WL 4808193, at *21 (D.S.C. July 27, 2011) (citations omitted) (report and recommendation), adopted in part, 2011 WL 4808264 (D.S.C. Oct. 11, 2011). In this case, arguably Anthony ultimately took both Letters into account in proposing plaintiff's suspension, (see Gov't Ex. 26, DE # 50-1, at 16), and as such, a reasonable employee might have found either Letter materially adverse. The court assumes, without deciding, that the Letter of Warning and the Letter of Reprimand are adverse employment actions. Finally, as to this element, defendant does not address plaintiff's suggestion that the changing of plaintiff's timecard from Jury Duty status to AWOL status was an adverse employment action. Because that conversion of plaintiff's leave resulted in plaintiff not receiving pay for one week, (see Second Am. Compl., DE # 42, ¶ 84 ("Anthony's harassment continued up to the point of changing Plaintiff's timecard . . . thereby penalizing Plaintiff['s] . . . pay."), the court concludes that such action was also an adverse employment action. Therefore, plaintiff has established the second element of her *prima facie* case.

Next, plaintiff is required to show that a causal connection exists between the protected

29

activities and adverse actions.    Plaintiff relies primarily on temporal proximity to make this

showing.    "While evidence as to the closeness in time far from conclusively establishes the

requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie

case of causality."    Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 551 (4th Cir. 2006)

(citation and internal quotation marks omitted)).    "The cases that accept mere temporal

proximity between an employer's knowledge of protected activity and an adverse employment

action as sufficient evidence of causality to establish a prima facie case uniformly hold that the

temporal proximity must be 'very close.'"    Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273

(2001) (citations omitted).    Generally, a period of three months or longer, without more, is not

sufficient.    See, e.g., Perry v. Kappos, 489 F. App'x 637, 643 (4th Cir. 2012) (three months);

Shields v. Fed. Express Corp., 120 F. Appx. 956, 963 (4th Cir. 2005) (three to four months).

Here, based on temporal proximity alone, plaintiff can establish a *prima facie* casual

connection only between the submission of the initial Confirmation of Request for Reasonable

Accommodation and the Letter of Warning, both of which occurred on the same day, and, in the

light most favorable to plaintiff, with her request occurring first.    All of the other adverse

employment actions took place three months or more after plaintiff engaged in a protected

activity.    Thus, plaintiff has satisfied the third element of a *prima facie* case only as to the Letter

of Warning.    Considering only the Letter of Warning as purportedly retaliatory action, defendant

has come forward with a legitimate, non-discriminatory reason for taking that action—plaintiff's

misconduct.    In response, plaintiff argues that she has shown pretext because "[t]he basis of the

Letter of Warning . . . w[as] nothing more than 'she says—she says' situation[], with no

independent verification from a third party" and "Anthony chose to believe Perry's version over

Plaintiff without any analysis of credibility of their respective face to face interviews." (Pl. Mem., DE # 54, at 25.) Anthony does not deny that she believed Perry over plaintiff. She states, "I believed Ms. Perry over Ms. Merrill when the facts that I saw presented in front of me proved that Ms. Perry was correct." (Anthony Dep., DE # 55-43, at 205.) Anthony <u>did</u> analyze credibility, and simply because her credibility assessment did not favor plaintiff, or even if she was wrong in that assessment, does not evidence pretext. <u>See</u> <u>Rivera-Aponte v. Rest. Metropol #3, Inc.</u>, 338 F.3d 9, 11-12 (1st Cir. 2003) (finding that a cursory pre-termination investigation, in which the plaintiff was never allowed to explain his side of the story, did not show that the real reason for termination was discrimination); <u>Trent v. Constellation Energy Grp., Inc.</u>, No. CIV. A. CCB-08-1271, 2009 WL 2044130, at *5 (D. Md. July 8, 2009) (["E]mployers are free to rely on allegations of misconduct in making [disciplinary] decisions, so long as their reliance is reasonable and in good faith." (citations omitted)). Furthermore, the Letter of Warning was not based exclusively on plaintiff's interaction with Perry. It was largely based on plaintiff's responses to questions from Anthony. Because plaintiff cannot show the EPA's reason for issuance of the Letter of Warning was pretextual, the court could end its analysis here.

However, even if one assumes plaintiff has brought forth sufficient evidence of a retaliatory animus to make a *prima facie* case of causation as to the other four adverse employment actions, <u>see</u> <u>Hart v. Hanover Cty. School Bd.</u>, No. 3:10-CV-794, 2013 WL 1867388, at *5 (E.D. Va. May 2, 2013) ("Most frequently, courts look to ongoing retaliatory animus or intervening antagonism during the period between the protected activity and the adverse action in order to find a causal connection where there is a lack of temporal proximity." (citing <u>Lettieri v. Equant Inc.</u>, 478 F.3d 640, 650 (4th Cir. 2007); <u>Robinson v. Se. Pa. Transp.</u>

<u>Auth.</u>, 982 F.2d 892, 895 (3d Cir. 1993)), <u>aff'd</u>, 547 F. App'x 298 (4th Cir. 2013), defendant has come forward with legitimate, non-discriminatory reasons for those actions—plaintiff's misconduct on a number of occasions.   Between her various briefs, plaintiff makes several arguments in support of her contention that the proffered reasons for the adverse employment actions are pretextual.

First, the court address plaintiff's claim that the "encyclopedia of documents condemning [her] is evidence of retaliation itself."   (Pl. Mem., DE # 72, at 51; Pl. Reply, DE # 102, at 24.) That the EPA may have been documenting plaintiff's misconduct and in effect "building a case" against plaintiff does not equate with retaliatory animus.   <u>See</u> <u>Sellers v. Giant Cement Holding,</u> <u>Inc.</u>, No. CA 3:11-2803-JFA-SVH, 2013 WL 4436470, at *3, 14 (D.S.C. Aug. 14, 2013) (rejecting the plaintiff's pretext argument that "'the sheer volume of the write ups' can be inferred to suggest that [a supervisor] was trying to build a case against Plaintiff so that he could terminate him" and recognizing that "'building cases' against under-performing employees does not demonstrate a discriminatory animus").   Anthony documented the issues between plaintiff and Perry well before any discussion with plaintiff about teleworking.   Also, around the time of their initial discussions about plaintiff's teleworking, Anthony documented plaintiff's failure to timely read a manual, plaintiff's failure to respond by email upon completion of the assignment, and her counseling of plaintiff about responding to requests in the future.   Thus, this is not a case of where an employer's documentation "against" an employee suddenly appears "out of the blue" to coincide with the first protected activity.   The volume of documentation generated to support the adverse employment decisions against plaintiff is not indicative of pretext.[12]

---

[12] Plaintiff's statement that "Anthony maintained copious notes on Plaintiff, but not any of the other employees," (Pl. Mem., DE # 54, at 28), is not supported by any evidence.

Plaintiff also contends that her positive performance evaluations support an inference of pretext. Anthony's end of year ratings of plaintiff's performance were "exceeds expectations" or "fully successful." (DE # 73-3.) Although these are certainly favorable, the evaluations noted areas for improvement, including "[c]ontinue to work on relationships to be consistent with all team members," (DE # 73-3, at EAM 16470), "[b]e more responsive to assignments," (id.), "be more responsive to emails and requests for information," (id. at EAM 16473), "[w]ork on teamwork," (id. at EAM 16487), "[f]ollow directions from acting BC [Branch Chief] and team lead more carefully," (id.), "be more receptive and follow instructions from her team lead and branch chief and keep them better informed," (id. at EAM 16498), and "strive to meet due dates and/or communicate status," (id.). Indeed, the areas noted mirror the issues that Anthony documented plaintiff having problems with. If anything, the performance evaluations support the EPA's reasons for its actions, not pretext.

Additionally, plaintiff takes issue with the basis for each adverse employment issue. As to the Letter of Reprimand, plaintiff raises the same argument as she does with the Letter of Warning—that Anthony took Perry's word over plaintiff's word. There is nothing wrong in and of itself with Anthony believing Perry over plaintiff. Plaintiff also suggests that the punishment against her was unwarranted based on the EPA's treatment of another employee. According to plaintiff, Charles Phillips and Perry got into a heated discussion in Perry's office that plaintiff could hear, and Phillips stormed out, slamming the door; yet, Phillips received no disciplinary action. (Pl. Aff., DE # 72-2, ¶ 134.) While evidence of disparate discipline might be probative of pretext, see Laing, 703 F.3d at 721, the comparator must be similarly situated to the plaintiff but for the protected characteristic, id. at 719.

33

The more favorable actions towards the comparator must have taken place "under nearly identical circumstances," meaning that "the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." Most critically, "the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions."

Roberts v. Lubrizol Corp., 582 F. App'x 455, 459 (5th Cir. 2014) (citations omitted). Here, Phillips is not similarly situated to plaintiff. For one, shutting the door in someone's face while she is talking to you is different than slamming the door on the way out of the office. Furthermore, there is no evidence that Anthony was also Phillips's supervisor or that Phillips had previously engaged in unacceptable conduct (which plaintiff had as documented in the Letter of Warning). Most importantly, plaintiff received a Letter of Reprimand not only for the door shutting incident but also for failing to respond to emails from Perry and for disregarding emails from Anthony. In sum, plaintiff has not come forward with sufficient evidence of pretext as to the Letter of Reprimand.

As for the change of her timecard to AWOL status and her suspension, plaintiff spends a great deal of time addressing why the actions she took regarding jury service and a career ladder promotion qualifications review were justified. The court finds it unnecessary to delve much into the details related to these two issues. At bottom, plaintiff disagrees with Anthony's conclusion (and ultimately the EPA's determination) that plaintiff did not substantiate her request for court leave. She also disagrees with her supervisors requiring her to undertake the qualifications review when, in her opinion, it was unnecessary and might jeopardize her career. But, "it is . . . 'the perception of the decisionmaker which is relevant not the self-assessment of the plaintiff.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (citation

34

omitted). Therefore, the focus must be on whether plaintiff has come forward with evidence that the decisionmaker, i.e., Anthony, did not honestly believe plaintiff's actions warranted imposing discipline against her. See id. at 217-18. Plaintiff has not.

Plaintiff points to Anthony's persistent inquiries over the course of several months about the nature of, and documentation regarding, plaintiff's jury service, which plaintiff characterizes as harassment. However, EPA policy provides that "[u]pon return from jury service, th[e] employee] should submit to the supervisor a certificate of attendance signed by a clerk or other appropriate official." (DE # 50-1, at USA 15020.) Thus, Anthony certainly could require plaintiff to submit the appropriate documentation to substantiate her request for court leave. When the documentation showed that plaintiff's jury service had been rescheduled during the time plaintiff claimed as court leave, Anthony determined the request for court leave was unsubstantiated,[13] changed plaintiff's timecard for the period to AWOL, and used it as one ground for suspension. Plaintiff's lack of candor in response to two of Anthony's inquiries about jury service formed two other grounds for suspension. How Anthony perceived plaintiff's responses is necessarily subjective. Nothing plaintiff has come forward with shows Anthony's rationale and perceptions are unworthy of credence.[14] As the court recognized previously, and is worth repeating, "'it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's [adverse employment action].'" Dugan v. Albemarle Cty. Sch. Bd., 293 F.3d 716, 722–23 (4th Cir.

---

[13] EPA policy on court leave provides:
An employee is granted court leave for jury duty for the entire period of service, regardless of the number of hours per day or the days per week actually served on a jury during the period. However, a court leave is not granted during periods when the employee is excused or discharged by the court.
(DE # 50-1, at USA 15020.)
[14] Plaintiff does not dispute the failure-to-follow-instructions incident related to jury service which is cited as an additional ground for suspension.

2002) (latter alteration in original) (citation omitted).

Plaintiff's disagreement with being required to perform the qualifications review is irrelevant. No one disputes that she ultimately completed the task. What she was disciplined for in relation to the qualifications review is her failure to follow the instructions of a supervisor, namely the failure to meet specified deadlines and the failure to provide an explanation. Plaintiff does not deny that she failed to meet the deadlines as instructed or that she failed to offer an explanation as directed. Accordingly, there is nothing pretextual about Anthony's reliance on these incidents as grounds for imposing discipline against plaintiff.

It is important to emphasize that plaintiff was also suspended for failure-to-follow-instructions incidents unrelated to her jury service and the qualifications review. Plaintiff does not take issue with these other incidents. Plaintiff could have been suspended based on these incidents alone. (See DE # 50-1, at 17 ("The recommended penalty for the second offense of 'delay in carrying out or failure to carry out instructions in a reasonable time' is written reprimand to removal.").) That there are other legitimate bases justifying the suspension, that plaintiff does not challenge, further supports the court's conclusion that plaintiff has not shown that suspension based on the jury service and qualifications review issues is pretextual.

Finally, plaintiff contends that the EPA's reasons for its ultimate adverse employment action, termination, were pretext for retaliation. As with the other incidents involving Perry, plaintiff challenges Anthony's siding with Perry as a ground for termination. Anthony investigated the incident thoroughly, (see DE # 51-1, at 2-3), and set forth all the reasons supporting her conclusion that plaintiff's version was not credible, (id. at 11). Again, simply because Anthony did not believe plaintiff does not equate with pretext. See Pence v. Tenneco

36

Auto. Operating Co., 169 F. App'x 808, 811 (4th Cir. 2006) ("[I]t makes no difference if the employee was in fact guilty of misconduct; as long as the employer discharged the employee because it honestly believed that the employee had engaged in misconduct, then the employer has not discriminated on the basis of disability."). Plaintiff also challenges the incidents documented in the Notice of Suspension relating to leave. Plaintiff emphasizes that she "never worked late to make up time" and that she "came in early or worked late, then used the time in the latter part of the week if needed." (Pl. Mem., DE # 72, at 35.) Plaintiff's argument misses the mark. Anthony cited plaintiff's failure to follow Anthony's earlier instructions to obtain prior approval before working overtime, (Gov't Ex. 43, DE # 51-1, at 10), not that plaintiff failed to actually work or that plaintiff was working later to make up time off. Anthony also cited plaintiff's failure to follow leave procedures. (Id.) While Anthony ultimately approved all plaintiff's leave requests associated with these various incidents, (see DE # 102-2, at USA 02717, 02719, 02725, 02733, 02735), the fact remains that plaintiff did not follow the instructions she had been given or the EPA rules *prior* to working overtime or taking the leave. Anthony also cited plaintiff's lack of candor in claiming she arrived at work at 10:15 a.m. one day, when the facilities records show she swiped her badge at 10:47 a.m. (Gov't Ex. 43, DE # 51-1, at 9.) "Plaintiff stands firm in the fact that she was at work by 10:15" that day. (Pl. Mem., DE # 72, at 33.) But, that fact does not mean that Anthony's belief, based on the record of plaintiff's badge swipe, that plaintiff was not being candid was false.

Finally, plaintiff attempts to rely on Anthony's treatment of another employee, Brittany Jones, as a comparison to Anthony's treatment of plaintiff to show pretext as to her termination. Plaintiff claims "Jones had lied to Anthony several times, failed to follow Anthony's directions

on several occasions concerning the same action, yet Jones was not sanctioned in any way . . . ."

(Pl. Mem., DE # 72, at 35 (emphases removed) (citing DE # 72-3).)   Even accepting this

characterization, Jones's misconduct is not sufficiently similar to plaintiff's misconduct to make

Jones a valid comparator.   Additionally, plaintiff has not come forward with evidence of Jones's

disciplinary history, which is also necessary to validly compare the discipline (or lack thereof)

imposed on Jones with that imposed on plaintiff.

As with the suspension, it bears emphasizing that the incidents plaintiff challenges are not

the only incidents for which plaintiff was terminated.   Plaintiff does not claim pretext as to those

grounds for termination.   Plaintiff could have been terminated on those grounds alone, (see

Gov't Ex. 43, DE # 51-1, at 12), which further supports the court's conclusion that the stated

reasons for plaintiff's termination were not pretext for retaliation.

In summary, a reasonable juror could not conclude that the adverse employment actions

were taken against plaintiff but for her having requested reasonable accommodation and

engaging in protected activity related thereto.   Plaintiff is not insulated from discipline simply

because she had requested an accommodation and engaged in activities in furtherance of and/or

related to that request.   See Little v. F.B.I., 1 F.3d 255, 259 (4th Cir. 1993) ("[I]t is clear that an

employer subject to the Rehabilitation Act must be permitted to terminate its employee on

account of egregious misconduct, irrespective of whether the employee is handicapped.");

Roberts v. Gen. Elec. Co., 1 F.3d 1234 (4th Cir. 1993) (table) ("[A] retaliation claim is not a

protection for employees who engage in conduct that calls for discipline." (citing Armstrong v.

Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981)).

C.      Hostile Work Environment Claim

In order to establish a hostile work environment claim, a claimant must demonstrate that the alleged conduct: 1) was unwelcome; 2) resulted because of her gender, disability, or prior protected activity; 3) was "sufficiently severe or pervasive" to alter the conditions of her employment; and 4) was imputable to her employer.

While the first element is subjective, the rest of the test is made up of objective components based on a "reasonable person" standard. This Court has held that in order to prove the second element, a plaintiff must show that "'but for' the employee's sex [disability, or protected activity], he or she would not have been the victim of the discrimination." As for the third element, harassment is considered sufficiently severe or pervasive to alter the terms or conditions of the employment if a workplace is "permeated with discriminatory intimidation, ridicule, and insult."

Pueschel v. Peters, 577 F.3d 558, 564-65 (4th Cir. 2009) (citations omitted); see also Edmonson v. Potter, 118 F. App'x 726, 730 (4th Cir. 2004) (under Rehabilitation Act, adding the element of the plaintiff is a qualified individual with a disability). "Factors to be considered in analyzing the objective component include the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating rather than being a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." Edmonson, 118 F. App'x at 730 (citing Fox v. Gen. Motors Corp., 247 F.3d 169, 178 (4th Cir. 2001)).

It is not clear what conduct plaintiff contends constitutes harassment. She states, "The fact that the harassment was based on her disability is shown by the fact that all of the 'bad stuff' began and occurred after Plaintiff first sought reasonable accommodation . . . ." (Pl. Mem., DE # 54, at 27.) Plaintiff does not explain what that "bad stuff" is. To the extent she means the adverse employment actions taken against her, the court assumes without deciding that incidents of retaliation can establish a hostile work environment provided that they are sufficiently severe or pervasive. See Massaquoi v. D.C., 81 F. Supp. 3d 44, 53 (D.D.C. 2015) ("Although incidents of discrimination or retaliation can establish a hostile work environment if connected to a

39

pervasive pattern of severe harassment, the actions alleged by the plaintiff here do not rise to that level." (citations omitted)); <u>Fordyce v. Prince George's Cty. Md.</u>, 43 F. Supp. 3d 537, 552-53 (D. Md. 2014) ("Although these incidents may constitute materially adverse employment actions, supporting individual claims of retaliation, under the totality of circumstances they are not 'sufficiently severe or pervasive' to create a hostile work environment." (citation omitted)). The five purportedly adverse employment actions forming the basis of plaintiff's retaliation claim occurred over the course of approximately two years. Those actions were neither physically threatening nor humiliating. Rather, they were "standard, managerial acts . . ., which were exercised in a civil manner and facially supported by nondiscriminatory reasons." <u>Fordyce</u>, 43 F. Supp. 2d at 553. Further, as plaintiff has acknowledged in relation to her failure to accommodate claim, plaintiff's overall work performance was not affected. Plaintiff has not shown an objectively hostile work environment based solely on the adverse employment actions taken against her.

To further support her hostile work environment claim, plaintiff appears to rely on what her expert characterizes as a

> continuous flow of emails and email trails to and from Anthony, Perry, Helm and others about Merrill (questioning Merrill's actions, tracking her arrival and departure times, making sarcastic comments about her, etc.); and interviewing and preparing other employees to obtain evidence against Merrill and documented in Anthony's notes to her file, etc. (e.g., lack of concern for Merrill's pain but required her to attend all meetings even in very cold rooms).

(Pl. Mem., DE # 72, at 56-57 (quoting DE # 77-1, at 3-4); Pl. Reply, DE # 102, at 26 (same).)

Even accepting this characterization, those emails were between Anthony, Perry, Helm, and others <u>about</u> plaintiff. The emails were not <u>to</u> plaintiff, and there is no contention that she was

made aware of them until after her employment with the EPA ended.   See Fuelling v. New Vision Med. Labs. LLC, 284 F. App'x 247, 259 (6th Cir. 2008) (co-workers' allegations regarding the existence of offensive comments were not relevant to plaintiff's hostile work environment claim because co-workers did not allege that plaintiff was aware of the comments and because plaintiff herself did not claim that she was aware of those comments).

Plaintiff cannot show that the EPA's conduct was sufficiently severe or pervasive so as to constitute a hostile work environment.

### III.   CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is DENIED. Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's claims for retaliation and hostile work environment are DISMISSED.   Plaintiff's failure to accommodate claim remains.   Trial is hereby SET for 29 August 2016.

This 4 May 2016.



_____
W. Earl Britt
Senior U.S. District Judge